UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD KEITH MAUZEY, | No. C 05-3337 MHP (pr) |
| Petitioner, | **ORDER DENYING HABEAS PETITION** |
| v. | |
| A. P. KANE, warden, | |
| Respondent. | |

## INTRODUCTION

Ronald Keith Mauzey, a prisoner at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Ronald Keith Mauzey was convicted in Riverside County Superior Court in 1983 of several crimes stemming from his efforts to kill his divorcing wife's boyfriend. He shot the boyfriend and then, while on bail for that offense, tried to hire someone to kill the boyfriend because he was the only witness who could identify Mauzey as the shooter. He was convicted at a jury trial of conspiracy to commit first degree murder, attempted first degree murder, and two counts of soliciting another to commit murder. He was found to have used a firearm and inflicted great bodily injury in the attempted murder. See Resp. Exh. 1. On February 8, 1983, Mauzey was sentenced to state prison for 25 years to life on the conspiracy to commit first degree murder count. See Resp. Exhs. 1 and 2; Cal. Penal Code § 182. The sentences for the attempted murder count, the related enhancements, and the two solicitation

to commit murder counts were "stayed and stay to become permanent upon completion of time served" on the conspiracy count. Resp. Exh. 1, p. 2. Mauzey's habeas petition does not concern that conviction directly, but instead focuses on a January 9, 2004 decision by a panel of the Board of Prison Terms (now known as the Board of Parole Hearings ("BPH")) finding him not suitable for parole.

The BPH identified several factors in support of its determination that Mauzey was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if he was released. The factors identified included the circumstances of the crime, his inadequate performance in prison (i.e., his limited programming, lack of sufficient beneficial self-help programming, disciplinary record, and a psychological report that was not totally supportive of release), and his inadequate parole plans. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Mauzey sought relief in the California courts. The Riverside County Superior Court denied his petition for writ of habeas corpus in 2004 in a summary order that would not qualify as a reasoned decision. Resp. Exh. 28. The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for review. Resp. Exhs. 29-32.

Mauzey then filed his federal petition for writ of habeas corpus. The court construed Mauzey's federal petition for writ of habeas corpus to allege due process violations based on the alleged absence of some evidence to support the BPH's decision and the alleged abuse of discretion by the BPH in relying on an unchanging factor to deny parole. After an unsuccessful motion to dismiss, respondent filed an answer. Petitioner filed a traverse. The matter is now ready for a decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because Mauzey was incarcerated and the challenged action occurred at the Correctional Training Facility in

Soledad.  Soledad is in Monterey County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).  Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

Where, as here, the state court gives no reasoned explanation of its decision on a petitioner's federal claim, the habeas court does an independent review of the record as it is the only means of deciding whether the state court's decision was objectively reasonable.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

# DISCUSSION

A. <u>Due Process Requires That Some Evidence Support A Parole Denial</u>

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See <u>Sass</u>, 461 F.3d at 1127-28; <u>Board of Pardons v. Allen</u>, 482 U.S. 369 (1987); <u>Greenholtz v. Inmates of Nebraska Penal & Corr. Complex</u>, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. <u>Sass</u>, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in <u>Superintendent v. Hill</u>, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board. <u>Id.</u> at 1128 (quoting <u>Superintendent v. Hill</u>, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" <u>Id.</u> at 1129 (quoting <u>Superintendent v. Hill</u>, 472 U.S. at 457). The some evidence standard of <u>Superintendent v. Hill</u> is clearly established law in the parole context for purposes of § 2254(d). <u>Sass</u>, 461 F.3d at 1129.

A critical issue in parole denial cases concerns the BPH's use of evidence about the crime that led to the conviction. Three Ninth Circuit cases provide the guideposts for applying the <u>Superintendent v. Hill</u> some evidence standard on this point: <u>Biggs v. Terhune</u>, 334 F.3d 910 (9th Cir. 2003), <u>Sass</u>, 461 F.3d 1123, and <u>Irons v. Carey</u>, 479 F.3d 658 (9th Cir. 2007). <u>Biggs</u> explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a

4

due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability. See id. at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Recently, Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence. Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 479 F.3d at 665; see e.g., id. at 660 (inmate in 16th actual year of his 17-to-life sentence).

      The message of these three cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons). Sass did not dispute the principle that, other things being equal, a criminal act committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something,

5

exemplary behavior and rehabilitation in prison count for something according to <u>Biggs</u> and <u>Irons</u>.  <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies.  One must look to state law to answer the question, "'some evidence' of what?"

B.      <u>State Law Standards For Parole For Life Prisoners In California</u>

California uses indeterminate life sentences for persons convicted of murders and certain other crimes, including conspiracy to commit murder.  <u>See</u> Cal. Penal Code §§ 182, 187.  Conspiracy to commit first degree murder results in the same sentence as first degree murder.  <u>See</u> Cal. Penal Code § 182 ("When they conspire to commit any other felony, they shall be punishable in the same manner and to the same extent as is provided for the punishment of that felony.").  California's parole scheme described below provides that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

6

Both Mauzey and respondent base their arguments on the regulations for parole consideration of murderers, 15 Cal. Code Regs. § 2400 et seq.[1] Mauzey was not, however, convicted of murder and those regulations may not be the appropriate regulations. Instead, his case appears to be covered by the regulations at 15 Cal. Code Regs. § 2280 et seq. which apply to non-murdering life prisoners. The differences between the two sets of regulations is insubstantial. See 15 Cal. Code Regs. § 2400 (last paragraph).

One of the implementing regulations, 15 Cal. Code Regs. § 2281, allows for consideration of a wide range of information in determining suitability, see § 2281(b), and lists circumstances tending to show suitability and circumstances tending to show unsuitability, § 2281(c) and (d).[2] The regulation also provides that "[t]he panel shall first determine whether a prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2281(a). The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2282. For example, for kidnapping for robbery or ransom, the matrix of base terms ranges from the low of 8, 10, or 12 years to a high of 13, 15, or 17 years, depending on some of the facts of the crime. Some prisoners estimate their time to serve based only on the matrix. However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires him first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. In re Dannenberg, 34 Cal. 4th 1061, 1070-71 (Cal.), cert. denied, 126 S. Ct. 92 (2005). Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. See id. at 1070-71 (discussing use of matrix in murder cases); 15 Cal. Code Regs. § 2282(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole"). The California Supreme Court's determination of state law in Dannenberg is binding in this

7

1 federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

2 　　　　The California Supreme Court also has determined that the facts of the crime alone
3 can  support a sentence longer than the statutory minimum even if everything else about the
4 prisoner is laudable.  "While the Board must point to factors beyond the minimum elements
5 of the crime for which the inmate was committed, it need engage in no further comparative
6 analysis before concluding that the particular facts of the offense make it unsafe, at that time,
7 to fix a date for the prisoner's release."  Dannenberg, 34 Cal. 4th at 1071; see also In re
8 Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he
9 nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole"
10 but might violate due process "where no circumstances of the offense reasonably could be
11 considered more aggravated or violent than the minimum necessary to sustain a conviction
12 for that offense").

13 C.　　Some Evidence Supports The BPH's Decision In Mauzey's Case

14 　　　　The BPH found Mauzey unsuitable for parole, basing its decision on the
15 circumstances of the commitment offense, Mauzey's inadequate performance in prison (i.e.,
16 his limited programming, lack of sufficient beneficial self-help programming, disciplinary
17 record, and psychological report that was not totally supportive of release), and his
18 inadequate parole plans.

19 　　　　1.　　Commitment Offense

20 　　　　The facts of the crime were described in the probation officer's report as well as in
21 prior hearing transcripts:

22 　　　　In April 1981, Mauzey's wife, Elke, began divorce proceedings and moved in with
23 John Paullin.  On or about June 19, 1981, Mauzey tried to persuade Elke to leave Paullin,
24 telling her he knew Paullin's identity, had driven by Paullin's residence and was going to hire
25 people to "get him."  Exh. 5, p. 5.  Elke stated that Mauzey had been violent toward her in
26 the past and he had a violent temper when drinking.

27 　　　　On June 30, 1981, Paullin went to answer his front door at his home.  Mauzey kicked
28 open the door, pointed a .22 caliber rifle at Paullin and then shot him.  Id. at 4-5.  Mauzey

8

and Paullin struggled. Paullin suffered serious injuries and had to undergo surgery to repair his liver, pancreas, colon and stomach. Id. at 5. Paullin also had to undergo additional surgeries in later days and had long-term complications from the shooting. Id. at 5, 10.

On July 9, 1981, Mauzey was arrested and booked for attempted murder. He was released on bail. While he was out on bail, he engaged in the conduct that formed the basis for the conspiracy and solicitation convictions.

Mauzey solicited Arthur Carranza to kill Paullin because Paullin was the only person who could identify Mauzey as the shooter. Police detectives learned in November 1981 that Carranza had information concerning Mauzey possibly soliciting Carranza to murder Paullin. The police already knew that Mauzey had been arrested for the attempted murder of Paullin, that Paullin had testified against Mauzey and that Mauzey had been held to answer in Superior Court.

> Subsequently, on November 30, 1981, and December 7, 1981, detectives contacted Carranza who indicated that sometime after August, 1981, the defendant had taken a liking to him, invited him to live in his home and did on several occasions solicit him to kill Mr. Paullin as he was the only person who could identify him regarding the attempted murder. The defendant offered to buy Carranza a house, give him a job in his construction company and pay him $4,000.00 a month, not only for killing Mr. Paullin but also for assisting in illicit sales of cocaine. A slip of paper the defendant had given Carranza with John Paullin's name, make of car and home and business addresses was seized as evidence. Carranza advised the detectives the defendant drove him by Paullin's residence and business, showed him the probable route of travel between Paullin's home and business and suggested "sniping" Paullin while en route to his office. Carranza advised detectives he did not want to commit the murder himself but may find someone who would and that he did on one occasion contact another subject. It was later determined through the defendant's telephone records that in October, 1981, Carranza telephoned a Felix Salsedo for the purposes of soliciting the murder for the defendant. For the purpose of the investigation it was determined the informant [i.e., Carranza] would make contact with the defendant and should the defendant still be inclined to solicit Mr. Paullin's murder, Detective Brian McAuley would be introduced as "Wolf", a paid killer.
>
> On December 8, 1981, the informant met the defendant at his residence and during taped conversation the defendant made several comments regarding wanting Mr. Paullin killed. Appropriate payment for the killing was discussed and reference was made to "one grand", "a kilo", or "some coke."
>
> On December 9, 1981, Detective McAuley telephoned the defendant as "Wolf" concerning the solicitation for murder. In the recorded conversation the defendant provided the detective with information concerning Mr. Paullin and indicated he still wanted Paullin killed.
>
> On December 10, 1981, the informant again contacted the defendant regarding

9

> subject "Wolf" killing Paullin on Friday, December 11, 1981. The defendant indicated in reference to the killing of Mr. Paullin that it was too soon and that he wanted to postpone the killing until he was able to pay half down and the other half upon completion of the job.
>
> On December 11, 1981, an arrest warrant was obtained and the defendant was arrested without incident at his residence.

Resp. Exh. 5, pp. 6-7.

Mauzey spoke with the probation officer after his conviction and "essentially maintained his innocence in the instant matter feeling that the most he should have been convicted of was 'simple assault or assault with a deadly weapon'" because he had only gone to the house to scare the victim. Resp. Exh. 5, p. 7. With regard to the conspiracy and solicitation charges, Mauzey claimed that it was Carranza who had suggested getting rid of the witness and offered to kill Paullin to show his appreciation for what Mauzey was doing for him. Mauzey said he did not take the informant seriously. Id. at 8.

The BPH considered a circumstance and factors proper under California law. A circumstance tending to indicate unsuitability for parole is that the prisoner "committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2281(c)(1). The factors to be considered in determining whether that circumstance exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled or mutilated during or after the offense," "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. § 2281(c)(1).

The facts to be considered in looking at whether the commitment crime had the listed factors in § 2281(c)(1) are the facts from the whole episode, beginning with the shooting of Paullin through the last telephone call between Mauzey and Carranza. Although the sentences on the attempted murder and the two solicitation to commit murder convictions were stayed, they are not irrelevant, as Mauzey seems to assume in his arguments. Nothing in the record explains why the sentencing court stayed the sentences, but it most likely was

1  pursuant to California Penal Code § 654, which provides that "[a]n act or omission that is
2  punishable in different ways by different provisions of law shall be punished under the
3  provision that provides for the longest potential term of imprisonment, but in no case shall
4  the act or omission be punished under more than one provision."  Section 654 applies "not
5  only to individual criminal acts, but also to courses of conduct that are motivated by a single
6  intent or objective. [Citations.] Therefore, when multiple convictions are based on a single
7  act, . . . or an indivisible course of conduct, the use of such convictions must not result in the
8  defendant being 'punished under more than one' Penal Code provision."  People v. Pearson,
9  42 Cal.3d 351, 359 (Cal. 1986).  Due to the multitude of acts here, especially since the
10 attempted murder appears to have predated the formation of any conspiracy, section 654
11 apparently was applied to cause a single punishment for an indivisible course of conduct
12 intended to cause the death of John Paullin.  Mauzey's motive may have changed (from the
13 initial jealousy and anger to the later desire to silence a witness), but the objective of killing
14 Paullin remained the same.  Even though the sentences were stayed, section 654 does not
15 preclude the consideration of the facts that underlie those convictions to be considered in
16 determining whether the § 2281(c)(1) factors are present.   Otherwise, an accurate picture of
17 the extent of the conspiracy would not be possible: there is a significant difference between a
18 conspiracy to commit murder that had four overt acts (that neither party has identified in this
19 action) and a conspiracy to commit murder that included shooting the target of the conspiracy
20 with the intent to kill him as well as repeated efforts to hire a hit man to finish the job of
21 killing the target.  Consideration of the entire episode also is consistent with the regulation
22 that allows a criminal conviction resulting in a stayed or suspended sentence to "be
23 considered as part of the individual's criminal history . . . or as an integral part of the
24 circumstances of an offense for which the prisoner is currently committed to prison."  15 Cal.
25 Code Regs. § 2326(b).

26     The BPH denied parole and relied on the circumstances of the commitment offense in
27 doing so.  The BPH stated: "The offense was carried out in an especially violent and brutal
28 manner.  The offense was carried out in a manner which demonstrates an exceptionally

11

callous disregard for human suffering and life." RT 65.

There was some evidence to support the BPH's reliance on the circumstances of the offense as tending to show Mauzey was not suitable for parole. This criminal episode involved a long term commitment by Mauzey to the goal of killing Paullin. Mauzey was not satisfied to merely shoot and gravely injure Paullin, and took further steps to have him killed. Mauzey's murderous mind-set lasted for months, and continued even after he saw the devastation he had caused with the initial shooting. The facts truly do reflect an exceptionally callous disregard for human suffering and life. The BPH identified far more than the minimum elements of a conspiracy when it pointed out that the criminal conduct included Mauzey shooting the victim and soliciting his murder. See Dannenberg, 34 Cal. 4th at 1071. That the victim was not killed does not make Mauzey's crime any less reprehensible, especially because the evidence suggests that it was a lack of readily available cash rather than a lack of interest that eventually led Mauzey to postpone the murder he had solicited.

Even if the attempted murder and solicitations to commit murder could not be considered as part of the commitment offense, evidence regarding those additional crimes could be considered under 15 Cal. Code Regs. § 2281(c)(2), which allows the BPH to consider the prisoner's previous record of violence and under § 2281(b) which allows the BPH to consider all relevant and reliable information, including the prisoner's involvement in other criminal misconduct.

2.      Institutional Performance

Section 2281(b) specifically allows the BPH to consider a great range of relevant and reliable information, such as the prisoner's social history, "past and present mental state," and "past and present attitude toward the crime."   The BPH also may consider evidence that the "prisoner has engaged in serious misconduct in prison or jail" as tending to indicate unsuitability for parole. 15 Cal. Code Regs. § 2281(c)(6). The BPH also may consider, as tending to show suitability, that "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." 15 Cal. Code Regs. § 2281(d)(9).

The BPH found that Mauzey's performance in prison tended to show he was not suitable for parole. The BPH noted that he had programmed in a limited manner while incarcerated. He had not sufficiently participated in beneficial self-help as previously recommended by the BPH, by counselors and by his psychiatrists. The BPH stated that Mauzey "needs to participate in self-help, in order to face, discuss, understand and cope with stress in a non-destructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others." RT 67.

There was sufficient evidence to support the determination that Mauzey had not sufficiently participated in beneficial self-help programming. The record had extensive evidence that Mauzey had a substance abuse problem before he arrived at prison. He told the probation officer that the shooting was the result of personal problems and done after he "had been on a 3 day binge and had used cocaine." Resp. Exh. 5, p. 7, 11. At trial, he had asserted a diminished capacity defense due to heavy use of alcohol and cocaine with regard to the attempted murder charge. See Resp. Exh. 6 (2/25/98 hearing) RT 21-22. Mauzey contended that his alcohol and cocaine abuse was limited to a 3-month period of time in 1981, see RT 39, but the evidence indicated that the problem lasted longer than that. See RT 39; Resp. Exh. 24, p. 2 (psychologist wrote that Mauzey "denies any history of substance abuse whatsoever until a three month window in which the commitment offense occurred"). For example, Mauzey had a DUI conviction in 1980 that was eight months before the attempted murder and a reckless driving conviction involving his alcohol consumption in 1981 that occurred outside the window of time he identifies as his sole time of abuse. See Resp. Exh. 5, p. 3; RT 39-40. And the probation officer's report showed that his ex-wife had complained of his violent temper when he drank.

Mauzey takes issue with any requirement that he participate in an AA or NA program. He contends that such programs violate his First Amendment religious freedom rights by violating the Establishment Clause in that they are religion-based programs. The BPH doubted the sincerity of this protest because Mauzey had long refused to participate solely on the ground that he had no substance abuse problem and currently was willing to participate in

13

1  such a program if it was required on parole. <u>See</u> RT 39-41, 46-47, 50-51, 69-70; <u>see also</u>
2  Resp. Exh. 6 (2/25/98 hearing transcript) at 23-25, 32-33; Resp. Exh. 4 (2/20/96 hearing
3  transcript) at 30-34.  However, even assuming it to be a sincere protest, the BPH determined
4  it was not well-founded because numerous other self-help programs that had no religious
5  affiliation had been identified for Mauzey and he failed to participate in those also.  RT 48-
6  49.  At earlier parole consideration hearings, the BPH panel had told Mauzey to consider any
7  self-help and therapy programming that may become available, including self-study materials
8  or motivational books.  <u>See</u> Resp. Exh. 8 (9/24/02 hearing) RT 50; <u>see also</u> Resp. Exh. 7
9  (10/31/00 hearing) RT 15-16, 63; Resp. Exh. 4 (2/20/96 hearing) RT 41-45.  Despite the fact
10 that panel members had on earlier occasions identified other self-help programs besides AA
11 and NA, Mauzey nonetheless continued to maintain at the 2004 hearing that the BPH was
12 trying to force him to become a Christian or participate in NA or AA to obtain parole.

13        The was some evidence to support the BPH's determination that Mauzey's disciplinary
14 record tended to show he was unsuitable for parole.  He had received eight CDC-115s for
15 rule violations, some of which were quite recent.  Mauzey had received one CDC-115 since
16 his last parole consideration hearing in 2002, for refusing to move from his cell to a dorm.
17 <u>See</u> Resp. Exh. 10.  He also had received one CDC-115 just before his last hearing in 2002
18 for refusing to provide required DNA samples.  <u>See</u> Resp. Exh. 9.  In past years he had
19 received other CDC-115s for failing to comply with grooming standards (by maintaining too
20 long of a mustache after having received two CDC-128s for this rule violation) in 1998, for
21 refusing to comply with an order and being contentious with a sergeant in 1998, for
22 introducing contraband (i.e., a note giving directions on how to manufacture
23 methamphetamine) into a facility in 1997, for refusing to show skin for a prisoner count in
24 1997, for fighting in 1995, and for disclosing confidential information (that he had acquired
25 as a clerk) in 1990.  <u>See</u> Resp. Exhs. 11-17.  (He also received several more CDC-115s after
26 the 2004 hearing, but those are irrelevant to the question of whether some evidence supports
27 the BPH's decision in 2004.)   Mauzey also had received five CDC-128 counseling
28 memoranda for lesser rule infractions.  Resp. Exh. 22 (disciplinary sheet).

There also was evidence to support the BPH's reliance on the psychological report dated September 29, 2003, which was "not totally supportive of release." RT 66. The psychologist opined that, "[i]f released to the community, his violence potential is somewhat higher than that of the average citizen in the community due to his history of violence and history of involvement with alcohol and drugs." Resp. Exh. 23, p. 3. The BPH also noted that the psychologist had noted that, although Mauzey denied having an alcohol or drug problem and was resistant to attending Alcoholics Anonymous, "it would be reasonable to monitor his drug and alcohol consumption through urine testing on a random basis if he were granted parole." RT 66-67; Resp. Exh. 23, p. 3. The current diagnostic impression in 2003 had not changed from the diagnostic impression in the 1999 psychological report: Mauzey had an "Antisocial Personality Disorder, much improved." Resp. Exh. 23, p. 2, and Exh. 24, p. 3.

The BPH's consideration of and reliance on Mauzey's insufficient participation in beneficial self-help programming, his continued disciplinary problems, and the psychological report was proper and was supported by sufficient evidence.

### 3. Inadequate Parole Plans

The prisoner's parole plans can be considered by the BPH. Among the circumstances listed as tending to show suitability are the existence of realistic plans for the release or the development of marketable skills that can be put to use upon release. See 15 Cal. Code Regs. § 2281(d)(8).  Section 2281(b) allows the BPH to consider "any other information which bears on the prisoner's suitability for release."

The BPH relied on Mauzey's inadequate parole plans in determining that he was unsuitable for parole. RT 67. Specifically, the BPH noted that Mauzey "has no written confirmation of a residence or a job offer." RT 67.

Mauzey had been a construction contractor and business owner before his imprisonment at age 37. He also apparently had taken classes in and/or done accounting work before his incarceration. He had graduated from high school and had some college work done before he was incarcerated. Mauzey thus had ample skills to accomplish his

15

1 intended plan to work in the construction industry and then pursue a contractor's license if he
2 was paroled. See RT 37-38. Any requirement that Mauzey become trained in another trade
3 – such as in typewriter repair or dry cleaning – would not be a sufficient reason to deny
4 parole. The parole authority rightly may be concerned with a prisoner's employment
5 prospects if he is paroled, but Mauzey had enough training and experience in a field with
6 employment potential that he did not need to be further trained in another field that had less
7 potential. Tying up a slot in one of the vocational trade training programs just to fulfill the
8 requirement that a parolee have two or more trades elevates form over substance in the parole
9 planning department.

10  The BPH correctly noted, however, that Mauzey had no job offers. While he had a
11 marketable trade of construction skills, he had no evidence that someone actually wanted to
12 hire him. The BPH also noted that Mauzey had no current written confirmation that he could
13 live in one of his mother's homes. The BPH's determination that the parole residence plans
14 had to be evidenced in a current writing was not unreasonable but alone would not have
15 provided some evidence of unsuitability. The BPH's reliance on the inadequate parole plans
16 alone would not alone support a finding that an inmate was unsuitable for parole, but could
17 be considered as a small part of the overall picture of Mauzey. "Circumstances which taken
18 alone may not firmly establish unsuitability for parole may contribute to a pattern which
19 results in a finding of unsuitability." 15 Cal. Code Regs. § 2281(b).

20  4. There Was Enough Evidence To Support The Decision

21  As with many parole denial habeas petitions, there is not much dispute about the facts,
22 but instead about what they mean. The weight to be attributed to the commitment offense
23 may fade over time as a predictor of current dangerousness, but the rate at which the criminal
24 conduct fades as a predictor slows down when the prisoner engages in further misconduct
25 and does not demonstrate rehabilitation. Here, Mauzey had accumulated eight CDC-115s for
26 rule violations in prison and five CDC-128s for lesser infractions. One of the rule violations
27 was for fighting, indicated a continued tendency toward violence. He also had a substance
28 abuse problem that he refused to address. This refusal to address the substance abuse

16

problem, plus his repeated violation of prison rules plus his commitment offense raise grave concerns about his ability to comply with the law and refrain from violence if released. They indicate that his rehabilitation is still a work in progress. While Mauzey and other prisoners decry the use of the unchanging evidence of pre-incarceration events, in-prison behavior is something the prisoner has control over, and the fact that a prisoner continues to violate prison rules indicates that he does not have a very high level of self-control, especially when the misconduct occurs years into the sentence and at a time when he should realize how such conduct will reflect on his parole suitability. Biggs and Irons did not stand for the proposition that in-prison behavior doesn't matter -- to the contrary, they stand for the proposition that old bad facts can at a certain point be overcome by more recent good facts regarding a prisoner's ability to conform to societal norms. Mauzey's continued misconduct in prison plus his refusal to address a substance abuse problem support the BPH's view that he is not suitable for parole and would present a danger to society if released on parole even though he had already been in prison 21 actual years since his 25-to-life sentence was imposed.

The state court's rejection of Mauzey's insufficient evidence claim was not an unreasonable application of or contrary to the Superintendent v. Hill standard. There was some evidence to support the BPH's determination that Mauzey was unsuitable for parole based on the circumstances of the commitment offense, his unimpressive in-prison behavior and his inadequate parole plans. He is not entitled to the writ.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: April 25, 2007

Marilyn Hall Patel
United States District Judge

17

# NOTES

1. The regulations for parole consideration for prisoners convicted of murder also apply to prisoners convicted of certain attempted murders. <u>See</u> 15 Cal. Code Regs. § 2400 ("The criteria and guidelines in this article apply to prisoners sentenced to prison for first and second degree murders committed on or after November 8, 1978 and attempted murders where the perpetrator is sentenced to life pursuant to the provisions of Penal Code § 664.") Although Mauzey was convicted of attempted murder as well as of conspiracy to commit murder, his primary sentence is for conspiracy to commit murder. His attempted murder sentence was stayed and he is not now serving a sentence on an attempted murder, so his case is not considered under the regulations at § 2400 et seq.

2. The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and serious misconduct while in prison. 15 Cal. Code Regs. § 2281(c). The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2281(d). The circumstances listed as tending to show unsuitability and suitability "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." 15 Cal. Code Regs. § 2281(c) and (d).